UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-14030-CANNON/MAYNARD

UNITED STATES OF AMERICA

v.

KEYON LEWIS,

                      **Defendant.**

_____/

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits its Sentencing Memorandum in the above-referenced case.

## BACKGROUND

On July 13, 2023, a federal grand jury in the Southern District of Florida returned an Indictment charging Keyon Lewis ("Lewis") with distribution of a mixture and substance containing a detectable amount of fentanyl, the use of which resulted in the death of D.C., in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) (Count One), and possession with intent to distribute a mixture and substance containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) (Count Two) [ECF No. 1].

On February 20, 2024, Lewis pleaded guilty to Count One of the Indictment, pursuant to a written plea agreement with the United States [ECF Nos. 86-88]. As part of the plea agreement, the United States and Lewis agreed that "they will jointly recommend that the Court impose a sentence of 20 years' imprisonment" [ECF No. 87 at ¶ 8].

1

Lewis' sentencing hearing is scheduled for May 21, 2024. The United States anticipates D.C.'s widow, J.S., will seek permission to address the Court at Lewis' sentencing hearing. The United States anticipates J.S.'s testimony will last approximately five minutes.

According to the Presentence Investigation Report ("PSI"), Lewis has a total offense level of 35 and criminal history category of III, which yields an advisory sentencing guideline range of 210 – 262 months' imprisonment [PSI at ¶¶ 33, 46, 73]. Lewis, however, is subject to a mandatory minimum sentence of 240 months' imprisonment, and statutory maximum of life imprisonment, which results in an effective guideline range of 240 – 262 months' imprisonment [PSI at ¶¶ 72-73; *see also* 21 U.S.C. § 841(b)(1)(C)]. Lewis's total offense level includes an enhancement under U.S.S.G. § 2D1.1(a)(2) because death resulted from the fentanyl he sold to D.C. [PSI at ¶ 24].[1]

Against this backdrop, and for the reasons that follow, the United States requests the Court to follow the parties' joint recommendation and sentence Lewis to 240 months' imprisonment. The United States submits a sentence of 240 months' imprisonment, is sufficient, but not greater than necessary, to reflect the nature and circumstances and seriousness of the offense, the history and characteristics of the defendant, the need to promote respect for the law, provide just punishment, afford adequate specific and general deterrence, and protect the public from further crimes of the defendant.

---

[1] Without the enhancement, there would be no mandatory minimum and Lewis' guideline range would be 10 – 16 months' imprisonment.

## ANALYSIS

The overarching objective of a sentencing court is to fashion a sentence that is sufficient, but not greater than necessary, to accomplish the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The sentencing court should begin the process by correctly calculating the applicable guideline range and must "remain cognizant of [the Guidelines] throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). Section 1B1.1 of the Sentencing Guidelines outlines, in express language, the order which district courts are to proceed. First, the district court calculates the applicable guideline range. U.S.S.G. § 1B1.1(a). Second, the district court applies any applicable departures under Sections H and K of Chapter 5. U.S.S.G. § 1B1.1(b). After the first two steps are complete, "the Court shall then consider the applicable factors in 18 U.S.C. § 3553(a) taken as a whole." U.S.S.G. § 1B1.1(c).

The Section 3553(a) factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocations training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established in the Guidelines;

(5) any pertinent policy statement by the Sentencing Commission;

(6) the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1)-(7).

"Nothing requires a sentencing court to give the advisory guidelines range as much weight as it gives any other § 3553(a) factor or combination of factors." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1259 (11th Cir. 2015). "A sentence's variance outside the guidelines range, whether upward or downward, represents a district court's judgment that the combined force of the other § 3553(a) factors are entitled to greater weight than the guidelines range." *Id*. "Placing substantial weight on a defendant's criminal record is entirely consistent with § 3553(a) because five of the factors it requires a court to consider are related to criminal history." *Id*. at 1263 (citing 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C), and (a)(6)).

### *Nature and Circumstances and Seriousness of the Offense*

On November 7, 2021, at approximately 12:50 a.m., "J.S." arrived at her home in Indian River County, Florida, which is located within the Southern District of Florida, and found her husband, D.C., dead from an apparent overdose. D.C. was 35 years old when he died. J.S. found D.C. slumped over in the kitchen. J.S. immediately called 911 and stated that her husband was on the floor and appeared to be dead. J.S. described D.C. as purple and cold, and advised the dispatcher D.C. had a drug problem [PSI at ¶ 5].

At approximately, 1:30 a.m., Indian River County Sheriff's Office ("IRCSO") Detective Brandon Dean arrived at the scene. D.C. had been pronounced dead by the time Detective Dean arrived at the scene. Detective Dean observed a light brown powdery substance in a plastic baggie, syringe, and spoon on the kitchen counter near D.C.'s body, which was still present at the

scene. The light brown powdery substance tested positive for, among other things, fentanyl. The substance was tested by the Indian River Crime Laboratory. Toxicology reports revealed that D.C.'s blood contained, among other things, ethanol and fentanyl. Detective Dean also located a cellphone on the kitchen counter near the fentanyl and drug paraphernalia [PSI at ¶¶ 7-8].

J.S. explained to Detective Dean that she last saw D.C. on November 5, 2021, before she left to spend the weekend in Plantation, Florida with a friend. J.S. stated that D.C. had been drinking before she left "but not bad." J.S. did not speak with D.C. on November 6, 2021, although she called him several times during the day. J.S. left Plantation to come home on November 6, 2021, because she had a bad feeling something was wrong with D.C. J.S. advised that D.C. struggled with drug addiction. J.S. explained that D.C. had overdosed in the past and tried to hide his drug use from her. J.S. identified the cellphone on the kitchen counter as D.C.'s, and provided D.C.'s phone number and passcode. J.S. also gave law enforcement consent to search D.C.'s cellphone [PSI at ¶¶ 6, 8].

As Detective Dean was searching D.C.'s cellphone, he located a text message exchange between D.C. and a person saved as "Greg Barber," which appeared to be drug related. The text message exchange ended with a text from "Greg Barber" on November 5, 2021, at 8:51 p.m., saying "Come out." D.C. and "Greg Barber" also had several phone conversations on November 5, 2021 [PSI at ¶ 9].

J.S. advised Detective Dean that she recognized the phone number associated with "Greg Barber," and explained that D.C. frequently changed the names of the contacts saved in his phone to hide them from her. J.S. informed Detective Dean that the phone number associated with "Greg Barber" was the phone number for D.C.'s drug dealer [PSI at ¶ 10].

Later in the evening, on November 7, 2021, Detective Dean, IRCSO Detective Dylan Farinacci, IRCSO Sergeant Greg Stanley, and IRCSO Sergeant Ryan Eggers returned to J.S.'s residence. At approximately 9:30 p.m., Detective Dean texted "Greg Barber" from D.C.'s cellphone and ordered drugs. The following is a summary of the text message exchange:

| | |
|---|---|
| Detective Dean: | Yoo |
| "Greg Barber": | Yoo |
| Detective Dean: | Can u come thru |
| "Greg Barber": | Yea |
| Detective Dean: | 100 how long? |
| "Greg Barber": | You still owe me 20 |

[PSI at ¶ 11].

Detective Dean then called "Greg Barber" from D.C.'s cellphone, during which Detective Dean listened to "Greg Barber" speak and verified he was a male. Shortly thereafter, the following text message exchange took place between Detective Dean and "Greg Barber":

| | |
|---|---|
| Detective Dean: | Call me back |
| Detective Dean: | Can u hear me? |
| Detective Dean: | My phone fucked up |
| "Greg Barber": | You owe 20 |
| "Greg Barber": | I can come now |
| Detective Dean: | I got u on 120 |
| "Greg Barber": | Ok |
| "Greg Barber": | You gone be outside |

> Detective Dean:        Ya let me know when ur here
>
> "Greg Barber":         I'm here

[PSI at ¶ 12].

At approximately 10:13 p.m., immediately after "Greg Barber" sent the last text message indicating he had arrived, a black Chevrolet pickup truck turned onto D.C.'s street and stopped directly in front of D.C's driveway.[2] At approximately 10:14 p.m., Detective Dean received a call on D.C.'s phone from "Greg Barber." Immediately thereafter, the Chevrolet pickup truck attempted to turn around and exit D.C.'s neighborhood. Detective Dean and the other officers then initiated a vehicle stop of the Chevrolet pickup truck. Law enforcement did not observe any other vehicles travelling on D.C.'s street between 8:50 p.m. and 10:15 p.m. [PSI at ¶ 13].

The vehicle was driven by Lewis' girlfriend, Monet Wright ("Wright"). Lewis was sitting in the front passenger's seat. At approximately 10:17 p.m., Detective Dean approached the passenger's side of the vehicle, and engaged in a brief conversation with Lewis. During his conversation with Lewis, Detective Dean recognized Lewis's voice as the man he had just spoken with using D.C.'s cellphone, and observed a cellphone in Lewis' hand [PSI at ¶ 14].

At approximately 10:20 p.m., Lewis was directed to exit the vehicle. Lewis had a cellphone in his hand when he exited the vehicle. Lewis' cellphone was placed on top of the pickup truck [PSI at ¶ 14].

As soon as Lewis exited the vehicle, Sergeant Stanley observed two clear plastic baggies on the ground next to where Lewis' feet were when he exited the vehicle. Each baggie contained a light brown powdery substance. The light brown powdery substance tested positive for, among

---

[2] D.C. lived in a residential neighborhood in the West Vero Corridor area of Indian River County. There is only one way in and one way out of the neighborhood.

other things, fentanyl. The substance was tested by the Indian River Crime Laboratory. The color and packaging of the substance was consistent with the color and packaging of the fentanyl that was found next to D.C.'s body. At this point, Lewis was arrested for possession with intent to sell or deliver fentanyl. Incident to his arrest, law enforcement seized Lewis' cellphone [PSI at ¶ 15].

At approximately, 10:22 p.m., Detective Farinacci advised Lewis of his *Miranda* rights. Lewis acknowledged that he understood his *Miranda* rights, and agreed to speak with Detective Farinacci. Lewis confirmed the cellphone he had in his hand when he exited the vehicle was his [PSI at ¶ 16].

At approximately, 10:29 p.m., Detective Dean again called the number for "Greg Barber" from D.C.'s cellphone, at which point the cellphone Lewis had in his hand when he exited the vehicle displayed an incoming TextNow alert.[3]

On November 17, 2021, Detective Dean interviewed Phillip Due ("Due"). Due was one of D.C.'s coworkers and his contact information was stored in D.C.'s cellphone. Due stated that he was with D.C. from about 8:00 p.m. until 9:00 p.m. on November 5, 2021. Due advised that he arrived at D.C.'s residence at about 8:00 p.m. to hang out, at which point D.C. requested that they go to Applebee's to have dinner. Due drove D.C. to the Applebee's on 20th Street in Vero Beach. Due stated that he and D.C. ate at the bar, and that shortly before they left D.C. got up and walked outside for a few minutes, and then came back inside to pay the bill. Due then drove

---

[3] TextNow is an online messaging application that allows users to text and call any number in the United States. TextNow provides the user with a unique phone number that can be used on any smartphone, tablet, or desktop computer with an internet connection. The phone number provided by TextNow is different than the phone number assigned by the service provider associated with the cellphone.

D.C. home and dropped him off a little after 9:00 p.m. [PSI at ¶ 17; *see also* ECF No. 88 at pgs. 5-6].

Detective Dean obtained surveillance footage from the Applebee's. The surveillance footage shows Due and D.C. walking into the Applebee's at 8:23 p.m. D.C. is wearing the same clothes he was wearing when he was found dead inside his residence. The surveillance footage also shows Due and D.C. sitting at the bar talking, until about 8:43 p.m., at which point D.C. takes his cellphone out and appears to send a text message. The text message exchange between D.C. and "Greg Barber" on November 5, 2021, started at 8:43 p.m. At 8:51 p.m., the surveillance footage shows D.C. get up and walk outside to the parking lot, which was right after "Greg Barber" texted him to "Come out." As D.C. walked out of the frame of the surveillance camera, a black Chevrolet pickup truck can be seen entering the Applebee's parking lot. The surveillance footage shows D.C. walking back inside the Applebee's at 8:54 p.m. Due and D.C. both left the Applebee's at 9:00 p.m., which is also captured on the surveillance footage [ECF No. 88 at pg. 6].

Detective Dean ultimately obtained a search warrant for Lewis' cellphone, and law enforcement was able to extract some information from the device, including several incriminating text message exchanges between Lewis and D.C. The text message exchange between Lewis and D.C. from November 5, 2021, and the text message exchange between Lewis and Detective Dean (posing as D.C.) from November 7, 2021, were located on Lewis' cellphone [ECF No. 88 at pg. 6].

On January 30, 2022, the Chief Medical Examiner for Indian River County, Patricia A. Aronica, M.D., issued a report opining that D.C. died from "fentanyl and ethanol intoxication." Had this case proceeded to trial, Dr. Aronica would have testified that but for the presence of the fentanyl that was detected in D.C.'s system, D.C. would not have died, and that the amount of

9

ethanol detected in D.C.'s blood was not enough to kill him but for the presence of the fentanyl [PSI at ¶ 18; *see also* ECF No. 88 at pgs. 6-7].

Had this case proceeded to trial, Stacey L. Hail, MD, FACMT, an expert witness in the fields of medical toxicology and emergency medicine, would also have testified that but for the ingestion of fentanyl by D.C., and the acute intoxication that ensued, D.C. would not have died. Additionally, Dr. Hail would have testified that fentanyl was an independently sufficient cause of D.C.'s death [ECF No. 88 at pg. 7].

The nature and circumstances and seriousness of the instance offense justify a sentence of 240 months' imprisonment. It is difficult to envision a more serious offense than homicide. To be clear, Lewis distributed a fatal dose of fentanyl, a highly addictive and lethal controlled substance, to D.C., who died immediately after ingesting the fentanyl Lewis sold him.

Fentanyl has proven to be a deadly poison that does not discriminate. Its victims include every gender, race, age, and economic background, and its debilitating effects are the same across all demographics. "Fentanyl is a synthetic opioid that is up to 50 times stronger than heroin and 100 times stronger than morphine."[4] Even in small doses, fentanyl can be deadly. "As little as two milligrams, about the size of 5 grains of salt, can be fatal."[5] According to the Centers for Disease Control and Prevention ("CDC"), "fentanyl and other synthetic opioids are the most common drugs involved in overdose deaths. Over 150 people die every day from overdoses related to synthetic opioids like fentanyl."[6] The State of Florida has also seen an exponential

---

[4] https://www.cdc.gov/stopoverdose/fentanyl/index.html (May 7, 2024).

[5] https://stjohns.floridahealth.gov/newsroom/2022/07/2022-07-08-public-health-and-safety-alert-fentanyl.html (May 7, 2024).

[6] https://www.cdc.gov/stopoverdose/fentanyl/index.html (May 7, 2024).

increase in overdoses associated with fentanyl. "In 2020, more than 6,150 people died from overdoses involving fentanyl and fentanyl analogs in Florida."[7]

If there is ever any progress to be made stopping the unlawful distribution of dangerous and illicit substances, those who traffic in them, such as Lewis, must be held accountable for their actions. The United States submits a sentence of 240 months' imprisonment is sufficient, but not greater than necessary, to hold Lewis accountable for his actions.

### *History and Characteristics of the Defendant*

The United States recognizes that Lewis' upbringing was less than ideal. Lewis was exposed to drugs and lacked stability throughout his childhood. These factors likely took a toll on Lewis' mental and emotional wellbeing. Nevertheless, Lewis' troubled upbringing, on balance, does not negate the gravity of the harm he caused when he served D.C. that fatal dose of fentanyl on November 5, 2021. D.C. left behind a loving family, including a wife who still grieves the loss of her husband.

To the extent Lewis suffers from drug addiction, the United States submits the Bureau of Prisons is well equipped to deal with drug addiction through various treatment programs, and the United States submits the defendant should avail himself of those opportunities. While Lewis' voluntary drug abuse may have led to poor decision making, it in no way excuses his conduct.

---

[7] https://stjohns.floridahealth.gov/newsroom/2022/07/2022-07-08-public-health-and-safety-alert-fentanyl.html (May 7, 2024).

***The Need for the Sentence to Promote Respect for the Law, Provide Just Punishment for the Offense, Afford Adequate Specific and General Deterrence, and Protect the Public from Further Crimes of the Defendant***

Lewis' criminal history also merits attention as it reveals a disregard for the law and lack of respect for authority. Lewis, who is only 27 years old, has already been convicted of at least one felony, battery by an inmate against detention staff (2015) [PSI at ¶¶ 41-42]. Lewis also has misdemeanor convictions for resisting arrest (2015) and battery (2017) [PSI at ¶¶ 40, 43]. Lewis was last released from prison in November 2019 – he committed the instant offense in November 2021 [PSI at ¶¶ 41-42].

The United States submits Lewis' criminal history evinces an alarming level of recidivism, and suggests he will continue to violate the law when not incarcerated. Lewis' prior periods of incarceration clearly were not sufficient enough to impress upon him the need to obey the law and conform his conduct to the requirements of society.[8] The fact Lewis has not served a sentence as long as the one he now faces may well be the reason he continues to violate the law.

With that being said, the United States believes a sentence of 240 months' imprisonment is sufficient enough to: (1) deter Lewis from ever selling drugs again; and (2) serve as an example to others that there will be a high price to pay if they peddle dangerous drugs in the Southern District of Florida.

A sentence of 240 months' imprisonment is necessary to promote respect for the law, provide just punishment for the offense, afford adequate specific and general deterrence, and protect the public from further crimes of the defendant.

---

[8] It appears the longest amount of time in prison Lewis has served to date is approximately three years [PSI at ¶¶ 41-42].

*Parity in Sentencing*

Finally, Lewis should expect to be treated like other similarly situated defendants. Parity in sentencing among similarly situated federal defendants across the country is fundamental to the proper administration of justice. This principle is embodied in Section 3553(a)(6), which "is concerned with national disparities among the many defendants with similar backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007). Generally, "national uniformity is . . . taken into account by the Sentencing Guidelines, which are almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *Id*. at 626 (internal marks and citation omitted). Indeed, "[e]ven after *Booker* rendered the Sentencing Guidelines advisory, district courts have *in the vast majority of cases* imposed either within-Guidelines sentences or sentences that depart downward from the Guidelines on the Government's motion." *Hughes v. United States*, 138 S.Ct. 1765, 1777 (2018) (internal marks and citation omitted; emphasis added).

A sentence of 240 months' imprisonment adequately reflects the relevant 3553(a) factors, preserves the integrity of the Sentencing Guidelines, and promotes national uniformity.

By way of comparison, the United States offers the following cases for the Court's consideration, which involved similarly situated defendants who were convicted of drug trafficking offenses that resulted in death. *See United States v. Peterson Nozinord*, 9:21-cr-80184-MIDDLEBROOKS (S.D. Fla.) (defendant with a total offense level of 35 and criminal history category of III sentenced to 240 months' imprisonment after pleading guilty to distribution of fentanyl resulting in death);[9] *United States v. Jean Jameson*, 0:19-cr-60083-MARTINEZ (S.D.

---

[9] Nozinord's effective guideline range was 240 – 262 months.

Fla.) (defendant with a total offense level of 39 and criminal history category of III sentenced to 365 months' imprisonment after pleading guilty to distribution of fentanyl resulting in death);[10] *United States v. Christopher Massena*, 9:16-cr-80071-MARRA (S.D. Fla.) (defendant with a total offense level of 38 and criminal history category of IV sentenced to 360 months' imprisonment after being convicted at trial of distribution of fentanyl resulting in death).[11]

## CONCLUSION

Based on the foregoing, and consistent with the parties' joint recommendation, the United States respectfully requests the Court to sentence the defendant to 240 months' imprisonment.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   **/s/Michael D. Porter**
Michael D. Porter
Assistant United States Attorney
Florida Bar# 0031149
101 South U.S. Highway 1
Suite 3100
Fort Pierce, Florida 34950
Telephone: (772) 293-0950
Email:michael.porter2@usdoj.gov

---

[10] Jean's guideline range was 324 – 405 months.

[11] Massena's guideline range was 324 – 405 months.

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by either regular U.S. mail or inter-office delivery.

/s/Michael D. Porter
Michael D. Porter
Assistant United States Attorney