UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-14030-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

KEYON LEWIS,

     Defendant.

_____/

### **DEFENDANT'S AMENDED POSITION PAPER ON SENTENCING**

COMES NOW defendant, Keyon Lewis, by and through his appointed counsel, Kafahni Nkrumah, pursuant to Federal Rule of Criminal Procedure 32, Local Criminal Rule 88.8, and USSG § 6A1.2(b), and submits the following position with respect to sentencing in this case.

### **SENTENCING POSITION PAPER**

Mr. Lewis respectfully request this court take into consideration all the 18 USCA § 3553(a) factors and sentence him to a sentence of 240 months, to be followed by a term of supervised release. Mr. Lewis believes that this sentence is sufficient, but not greater than necessary to achieve the purposes of sentencing within 18 USC § 3553(a).

Mr. Lewis would like this court to be aware that his life experiences are not being offered to this court as an excuse for his conduct. It is being offered as mitigation evidence, which United States Supreme Court case law, and statutory authorities

clarifies, "… is not being provided as an excuse or justification for engaging in criminal conduct, but rather for the purpose of mitigation as to the length of sentence or type of punishment to be imposed as a result of that criminal conduct." See *Lockett v. Ohio*, 438 U.S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); See also, 18 U.S.C. § 3661 and 21 U.S.C. § 850.[1]

### *The Offense Circumstances*

On November 7th, 2021, J. S. arrived home and found her husband, D.C., dead from an apparent drug overdose and she called the authorities.  Law enforcement arrived on the scene and during their investigation they found text message exchanges that they believed to be drug related in D.C.'s cellphone.  Later that evening, the officers contacted the alleged dealers' cell number, by text using D.C.'s cell phone, and arranged a drug purchase to be made at D.C.'s home.  When the user of the cell phone texted the officers and informed him that he was at D.C.'s home, the officers stopped the vehicle in which Mr. Lewis was a passenger. Mr. Lewis was eventually arrested for state drug charges.

On July 13, 2023, a federal grand jury in the Southern District of Florida indicted Mr. Lewis in a two-count indictment with one count of distribution of fentanyl that resulted in a death (count one) and one count of possession with intent to distribute a controlled substance (count two). On February 20, 2024, Mr. Lewis

---

[1] Evidence about the defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, concurrence).

plead guilty, pursuant to a written plea agreement, to count one, distribution of fentanyl that resulted in a death, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). Mr. Lewis has fully allocated and has accepted responsibility for his conduct.

### A.     Mr. Lewis's Personal Circumstances

Mr. Keyon Lewis is a twenty-seven-year-old, African American man, born in Vero Beach, Fl., into a troubled situation and dysfunctional family. Mr. Lewis' parents, Mr. Tracey Norris and Ms. Takessa Lewis were not married when Mr. Lewis was born, his parents living separately in separate towns, and Mr. Lewis states that his father was not involved in his life during his childhood. Mr. Lewis' mother was suffering from drug and alcohol addictions during, and after, her pregnancy with Mr. Lewis, resulting in Mr. Lewis being born with an addiction to cocaine that he would eventually have to withdraw from, a painful beginning to a difficult life for this child.

Eventually, Mr. Lewis' mother lost custody of him, as well as all her children, and he was placed with his mother's sister, Ms. Errika Lewis, when Mr. Lewis was six (6) months old. When Mr. Lewis was relocated with his aunt, he was still suffering from the effects of fetal cocaine addiction and fetal alcohol syndrome. Interestingly, although Mr. Lewis was born with drug and alcohol disabilities, he was not initially taken from his mother, although his older siblings had previously been removed, and he lived with his mother for approximately six months before the state placed him in relative care. It should also be noted that all of Mr. Lewis' siblings, from his mother, have been placed in family foster care, either with Mr. Lewis maternal grandmother or with his aunt.

3

In speaking with Ms. Davis, she described Keyon's adjustment to living with her and her family as good while he was a child, but things started to change once he was old enough to start speaking with his siblings and his mother. "Keyon came to live with me when he was six months old. When he came to live with me, he was a good baby and child. I could tell he was developmentally delayed in some areas of development, but I didn't know exactly what disabilities he was suffering from. Keyon was a good child with a kind heart, and he was always willing to be of help to someone, family, or friends. Despite being given custody of Keyon under his particular circumstances; the Florida Department of Child Welfare (Florida DCF) did not provide any testing for mental disabilities for him, and I would have to eventually get him tested myself."

"When Keyon was finally tested, he was already in kindergarten. He was diagnosed as having bipolar disorder and he was also diagnosed with oppositional defiant disorder. While he was in school Keyon was given an IEP school program, which he had throughout his schooling, and he was placed in regular school classes. But as it usually happens with children who suffer with the mental disabilities that Mr. Lewis suffers from, they begin having behavioral problems in school and at home.

Ms. Davis remembers that Keyon's behavioral issues escalated after he began speaking with his mother again. "As a child, Keyon did not have any communication with his mother, I didn't let him speak with her because of the false promises and dreams she would tell her children, who like all children, wanted to be with their mother, no matter how difficult the circumstances. But once he became a teenager,

4

and he began communicating with his siblings more, one of his siblings gave him his mother's phone number, and he and his mother began communicating more frequently. I think Keyon's longing to be with his family helped to escalate the behavioral issues he was having in school. His mother would make promises that she just couldn't keep, but as a child, these promises are what he wanted to hear.  It was the drugs and guilt that was talking, but her children didn't know that, and what child doesn't want the love of their parent? At some point the pull became too much for Keyon and he left to go back to Vero to be with his mother when he was sixteen years old. Well, it didn't quite turn out like he had expected with his mother and after bouncing from place to place, he was just trying to find his way out there when all of this happened."

Ms. Davis talked about Mr. Lewis' experience at Fort Gordon. "Before leaving for Florida, Mr. Davis self-enrolled in the Fort Gordon Youth Challenge Academy. He was doing well at the program and was turning a corner. He enrolled because he wanted a chance to change the trajectory of his life, and he was actually turning a corner until he was attacked at the school by another student. When the school contacted me, Keyon was in the hospital, and I was told he had passed out. When I got to the hospital, I learned that he was hit in the head a couple of times with a Kevlar helmet. After this incident, Keyon began experiencing tremors and frequent headaches. I think the school was worried about Keyon suing them and they eventually pushed him out of the program. About 10 months after this happened, Keyon left for Vero Beach and went back to his mother."

Ms. Davis goes on to talk after Keyon left. "After Keyon returned to Vero Beach, we would talk frequently and Keyon soon realized what I had been trying to tell him, that his mother means well, and I really believe that she sincerely loves and wants to be with her children, but that isn't possible because of where she was at during that time in her life. After returning to Vero Beach, Keyon bounced around just trying to find his way."

In speaking with Mrs. Monet Wright, Mr. Lewis' wife, she talks about meeting a young man who soon came to know was a sweet, down-to-earth person who is very kindhearted and willing to help anyone. Ms. Wright states that her and Keyon have been together approximately four years and have been married for a little over a year.

"My children love Keyon. They see him as their father. My son, Aldin Dawson, age seven, calls him 'daddy.'  Since Keyon has been locked up, my son has gone into a depression, not wanting to play outside, staying in his room, and mopping around the house like he's lost his best friend. In speaking with him the other day he told me that 'he feels lost, first he lost his oldest brother, to death, and now he is losing his father. And what makes it worst is that he is being sentenced on my birthday, of all days!'"

"My daughter, Cur-Shanti Pittman, who is 5 years old, also knows Keyon as her father. She is super attached to Keyon and is always asking when he will be coming home and when she can see him again. I just don't know what to tell her. We also have been the primary caregiver for Keyon's daughter, her mother practically giving up custody to us, we got her when she was two weeks old. Keyon is a good

father and I know him not being there for his children is taking a toll on him. He was also a big brother to a lot of the kids in the neighborhood. They looked up to him and he was always encouraging them to go to school, to do well in school, and stay out of the streets, telling them that nothing good comes from living the street life."

"I miss him also, very much. Keyon stayed home taking care of the children, making sure they were ready for school, taking them to the bus stop, caring for them when they got home, cooking and cleaning, and basically being a Mr. Mom while I worked. He would also do odd jobs to try to help me with the bills, but him not being here has been horrible for me and his family. My having to work and finding care for my children, and just missing his companionship, has thrown our world into turmoil. He was getting ready to start working when all of this happened.  He was looking for work and didn't want to be in the streets.  He was trying to better himself and our family."

### B.  18 U.S.C. § 3553(a) in considering Mr. Lewis' sentence.

The mandate of 18 U.S.C. § 3553(a) is, of course, for the court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in paragraph Two of that same statute.  In *United States v. Chavez*, 584 F.3d 1354, 1364 (11th Cir. 2009), the Eleventh Circuit summarized the factors that a sentencing court must consider:

> "Post *Booker*, the imposition of a sentence by the district court in a criminal case … involves a two-step process. First, the district court must still determine the appropriate sentencing range under the guidelines. This step includes the consideration and application of applicable departures as authorized by the Guidelines or statute. Second, the district court must then consider the various factors

7

enumerated in 18 U.S.C. §3553(a) in ultimately arriving at a reasonable sentence.

See also, *United States v. Talley*, 431 F.3d 784, 787 (11th Cir. 2005) ("The § 3553(a) factors include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the kinds of sentences available; (6) the sentencing guidelines range; (7) pertinent policy statements of the Sentencing Commission; (8) the need to avoid unwanted sentencing disparities…. .

In Mr. Lewis' case, it is the circumstances of his current offense, the circumstances of his life, and his personal characteristics that justifies a sentence of two-hundred and forty months, with a period of supervised release to follow. Mr. Lewis' has taken full responsibility for his actions, evidenced by his willingness to plead guilty before trial.

Mr. Lewis is also very remorseful that his actions contributed to a loss of life. Mr. Lewis knew the decedent, D.C., for some time before this incident, them getting to know each other because D.C. was Mr. Lewis' barber. "D.C. was a cool dude, and he was my barber, that's how I meet him. I am extremely sorry, I never meant for anyone to die, and I apologize to his family, my family, and the community for my role in this tragedy. This is something that I will have to live with for the rest of my life."

### A. §3553(a) Factors

This Court's obligation to consider carefully, the 18 U.S.C. § 3553(a)(2) factors need for Mr. Lewis' sentence to "reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and also "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, is an obligation that is imposed by law. 18 U.S.C. § 3553(a)(2).

Excessively long sentences, however, fail to reflect the seriousness of the offense, undermine respect for the law, and fail to provide just punishment. *See United States v. C. R.*, 792 F.Supp.2d 343, 516 (E.D.N.Y. 2011) ("A sentence must be proportional to the defendant's crime.  A sentence that is disproportionately long in relation to the offense is unjust and fails to promote respect for the law); *see also United States v. Rogers*, 960 F.2d 1501 (10th Cir. 1992) (A sentence must be proportionate to the crime committed, and if the sentence is so disproportionate to the crime as to shock the moral sense of the community, the sentence is impermissible).  There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491 (N.D. Ohio 2012) (While a five-year mandatory prison term may be

less cruel than life in prison, as applied in cases like this one, it may well constitute "cruel and unusual punishment.").

### 1. The Possibly Effects of Mr. Lewis's Childhood Trauma

Trauma is a profound experience of the loss of security and welfare evoking feelings of fear, helplessness, harrow, and possibly disorganized agitation in children.[2]  The description of PTSD in the Diagnostic and Statistical Manual of Mental Disorders has increasingly taken into account child-specific features of PTSD, and PTSD has evolved from a disorder first associated with Vietnam veterans in the 1970's [3] to one which has now been well documented in the general population at an estimated 7 - 12%.[4]

And in specific groups of children, particularly high-risk children such as adolescent delinquents, an estimate of PTSD in the population of children and adolescents is still forthcoming but is believed to be much higher than that of the general population.  Dr. VV Ruchkin,[5] in a study that he has conducted, has pointed out that twenty-five (25) percent of adolescent delinquents met DSM-III PTSD criteria and forty-two (42) percent fulfilled partial PTSD criteria, percentages comparable to and exceeding those found in the population of Vietnam veterans, suggesting the vulnerability of childhood or adolescent experiences and the subjective

---

[2] American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders. 4th edition. Washington, DC, USA: American Psychiatric Association; 2000.
[3] Card JJ. Epidemiology of PTSD in a national cohort of Vietnam veterans.  Journal of Clinical Psychology, 1987; 43 (1):6-17 [Pubmed]
[4] Kessler RC, Sonnega A, Bromet E, Hughes M, Nelson CB Posttraumatic stress disorder in the national comorbidity survey, Archives of General Psychiatry. 1995;52(12):1048-1060.
[5] Ruchkin, V.V.; Schwab-Stone, M.; Koposov, R.; Vermeiren, R.; Steiner, H., Violence exposure, posttraumatic stress, and personality in juvenile delinquents, 41 Journal of the American Academy of Child and Adolescent Psychiatry, 322-329 (2002)

nature of trauma.

The latest DSM-IV-TR outlines the diagnostic criteria for PTSD following the occurrence of a traumatic event, including symptoms for longer than one month of (1) reliving the trauma, (2) avoiding associations related to the trauma, and (3) increased arousal resulting in "clinically significant distress or impairment in social, occupational, or other important areas of functioning."[6]  The description is keen to note the impact of childhood development on the triad of symptoms; for instance, in children, the response to the trauma may be expressed as disorganized and agitated behavior rather than intense fear, horror, and helplessness, and the reexperiencing may be expressed through repetitive play with traumatic themes, frightening dreams without recognizable meaning, and trauma-specific reenactment.[7]

Children may suffer trauma in many significant ways including developmental delays; numerous social, behavioral, and academic difficulties; somatic complaints; lower self-esteem; and attachment issues.[8]  As an anxiety disorder, one may imagine PTSD to be a source of strife for the victim and perhaps close a circle of contacts. However, rather than being a quietly contained disorder, the violence and chaos experienced by the victim through trauma may manifest as outward acts of aggression, delinquency, and conduct disorder behaviors and the like may be

---

[6] Pooja L. Amatya and Drew H. Barzman, ISRN Pediatrics, The Missing Link between Juvenile Delinquency and Pediatric Posttraumatic Stress Disorder: An Attachment Theory Lens (2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3384893/
[7] Id.
[8] Trickett, PK, McBride-Chang, C.,

considered as symptoms of PTSD, rather than isolated problems.[9]

In an electronic mental health newsletter by Dr. Joel I. Kimmel P.H.D., he speaks about "The Traumatic Effects of Abandonment" and its effects if not properly treated:

> "…Weather they were abandoned by parents who were not present, parents who were present but emotionally unavailable, or have been abandoned in relationships later in their lives, the effects can be quite devastating. Abandonment by a significant person leads to a sense of loss of love and connectedness. In early life, being cared for, being important to others and being wanted is critical. When rejection or abuse occurs, the message to the person is that they are not important and that they have no value. In children, this loss of psychological and physical protection leads to internalized chronic fear and shame. Imagine, if you will, growing up and living your life with the belief that you are not wanted and that you are worthless. How do you go on in life with these beliefs? In many adopted children, the ability to attach to others during the formative years is corrupted and many grow up to be adults who are untrusting of others and believe that they don't matter. Often, they develop a 'me against the world attitude.'"[10]

Dr. Kimmel goes on to talk about abandonment actually able to occur at any time during a person life cycle. He goes on to describe how an abandoned person feels going through the process mentally:

> "…Abandonment also includes an aloneness not by choice, feeling isolated even in relationships, feeling deserted by others, feeling not accepted by society because of gender or race…. Being abandoned is a situation that is taken personally. Those who have been abandoned believe that the abandonment was made by a person important to them who CHOSE to leave them, to reject

---

[9] Pooja L. Amatya and Drew H. Barzman, ISRN Pediatrics, The Missing Link between Juvenile Delinquency and Pediatric Posttraumatic Stress Disorder: An Attachment Theory Lens (2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3384893/

[10] Joel I. Kimmel, P.H.D., The Traumatic Effects of Abandonment! An Electronic Mental Health Newsletter from Joel I. Kimmel, Ph.D., Vol. 10, Number 7 (2015), https://kimmelpsychology.com/the-traumatic-effects-of-abandonment/

them. It causes a person to feel that they are unwanted, unimportant, and basically don't matter. Shame and low self-esteem accompanies abandonment. Consequently, it can be lifelong as many individuals spend their lives trying to disprove those beliefs. They often enter into poorly chosen relationships which either ultimately end in rejection or dependence upon the person to whom they are looking for acceptance. However, they basically don't trust others and have difficulty being open and intimate. They will often turn to addictive behaviors such as drinking and drugging to numb themselves to feel better. Abandoned people often become depressed and anxious with many fears as they lack confidence and a sense of identity. Many constantly look for any signs of potential rejection and can make excessive emotional demands in relationships. …"[11]

In another online medical newsletter, MedicalNewsToday, an article that was medically reviewed by Timothy J. Legg, Ph.D., CRNP and written by Jayne Leonard, *What to know about abandonment issues*, gives the reader a short and concise understanding of the effects of abandonment, especially in children. The author is clear to state that, "fear of abandonment is not a standalone mental health condition, such as depression, but it is a form of anxiety and even a phobia in some senses."[12] The author goes on to write about the effects of abandonment on those children who have been experienced the loss of a parent:

"In severe cases, such as those in which a child has experienced the loss of a parent or caregiver, they may develop unhealthy ways of coping, such as: addiction, disordered eating, lashing out at others, either physically or verbally, and self-harm.[13]

Mr. Lewis has been evaluated and diagnosed with the following mental disabilities, bi-polar disorder and oppositional defiant disorder, but he has not been

---

[11] *Id.*
[12] Jayne Leonard, medically reviewed by Timothy J. Legg, Ph.D., CRNP, What to know about abandonment issues, MedicalNewsToday, Feb. 26, 2020, https://www.medicalnewstoday.com/articles/abandonment-issues
[13] *Id.*

diagnosed for PTSD.  But if we were to look at some of the more traumatic events of his life, from being born addicted to cocaine and alcohol; through to the severe trauma suffered in the Fort Gordon attack, coupled with the difficulties with behavioral issues because of the mental disability he suffered from, these factors, as well as others, more than add up to the chances of Mr. Lewis being diagnosed with PTSD, along with Bipolar Disorder, highly probably.

Also being exposed to environments rife with poverty and violence, to include the factors that are most conducive to juvenile delinquency such as parental psychopathology, drug usage, neighborhoods with criminal subculture, low employment participation, frequent mobility among residents, and poor school conditions, these factors are factors that are conducive to juvenile delinquency, as well as trauma.  Mr. Lewis's exposure to very traumatic experiences in his early life, coupled with the mental disability that he has suffered from since early childhood, are certain to have had a detrimental effect on his decision making, then as well as now as an adult, and should be considered by this court.

In a case in the United States District Court for the Eastern District of New York, *U.S. v. Bannister*, 786 F.Supp. 2d 617, 688-89 (EDNY 2011), the Hon. Jack B. Weinstein authored an opinion which analyzed the impact that overwhelming negative risk factors present in and around a Brooklyn public housing project and its effects on the lives of the young men before the court for sentencing for conspiring to sell narcotics.

The Court's 57-page opinion complete with statistics on the deprivation of education, employment opportunity, poverty, drugs and violence over the past 40 years and futility and adverse consequences of imposing harsh mandatory minimum sentences, examined how those conditions served to derail the lives of each of the young men before the court for sentencing.   From the outset, Judge Weinstein observed:

> "As a group, defendants grew up in dysfunctional homes characterized by a combination of poverty, unemployment, under education, crime, addiction to drugs and alcohol, physical and emotional abuse, and the absence of an adult male role model. They attended low-functioning public schools with limited resources to help students with their in-and out--of-school difficulties.  Most dropped out of school, habitually abused drugs and alcohol from an early age, and found little lawful employment.  They became involved in a gang of illegal narcotics distributors, which turned to guns and violence, contributing to the degradation of their community."

*Bannister*, 786 F. Supp. 2d at 621.

Judge Weinstein noted, "While the defendants are before this court because of choices they themselves have made, the limited options available to them are partly the fixed artifacts of history.  Their story begins hundreds of years ago with the enslavement of African Americans.  It runs through Reconstruction, Jim Crow, northward migration, *de jure* and *de facto* segregation, decades of neglect, and intermittent improvement efforts by government and others." *Bannister*, 786 F. Supp. 2d at 624.

After a lengthy and scholarly review of the confluence of the conditions of poverty, race, crime, drugs and violence prevalent in the communities in which the young offenders were born and raised, Judge Weinstein observed in conclusion:

> "Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass.  Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befall these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth.  Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense.  That the defendants were born into circumstances without such support is at the center of this tragedy."

*Bannister*, 786 F. Supp. 2d at 688-89.

Mr. Lewis was not raised in a Brooklyn, NY housing project but the circumstances and factors that Judge Weinstein sets forth in his opinion manifest itself in communities of color throughout this country and has more than likely adequately described life as Mr. Lewis has known it.

### 2.  Other 3553(a) Considerations

The United States Sentencing Commission report, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), supports Mr. Lewis's request for a sentence of two hundred and forty months, with a period of supervised release to follow.  The findings of the Sentencing Commission's report, Figure 14, shows that the reconviction rate of offenders at the time of their release is highest among offenders who are younger than twenty-one at the time of their release, at 48.5%, and those between the ages of twenty-one to twenty-four years old at 48.4%.  These percentages

declined in each subsequent age grouping, with those who are between 25 and 29 years old at time of release being at 42.7%. Figure 15 in the same report also shows that the reincarceration rate by age at the time of their release was highest among those between the ages of 21 to 24 years old, at 38.6%, and declined in each subsequent age group, with those between the ages of 25 to 29 years old at 33.7%. The report also shows that time to reincarceration expands with age and the severity of reincarceration offense declined with age.[14]

Mr. Lewis would also respectfully request that this Court take into consideration the findings in the United States Sentencing Commission, *Measuring Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004), exhibit 9 shows that those in the age group of 21 to 25 at the time of sentencing, who fall in criminal history category I, have a recidivism rate of 22.3%, as compared to those, for example, in the 21 to 25 years of age bracket with a CHC III who recidivate at a rate of 42.7% and CHC VI who recidivate at a 68.1%.[15] This exhibit also goes on to show that Black males who are similarly situated in CHC I as Mr. Lewis, have a recidivism rate of 23.7%, which is the lowest percentage among Black males; lower than the recidivism rate of all Hispanic males except those in CHC's I and II; lower than the recidivism rate of all White males, except those in CHC"s I and II; and lower than all other males, except those in CHC I.

---

[14] The Effects of Aging on Recidivism Among Federal Offenders (Published Dec. 7th, 2017) can be found at: www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders
[15] The Sentencing Commission's report, including Exhibit 9, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.

When balancing the 3553(a) factors and the possible health consequences from incarceration, these factors also cut in favor of his request for a sentence of two-hundred and forty months, with a period of supervised release to follow. Mr. Lewis' health, including his mental health, are factors that this court can consider in fashioning a sentence. In a study in the Annual Review of Sociology[16] the authors documented a negative relationship between incarceration and a divers set of health conditions. For example, incarceration is associated with high levels of self-reported illnesses and the experience of incarceration (exposure) generally has a greater effect on health than the length of incarceration. Aside from general health conditions such as physical functioning, studies in this area have considered various distinct conditions, including infectious disease, cardiovascular disease, and formerly incarcerated person have an elevated risk for these chronic health conditions compared with the general population.[17]

And the effect of prisons on a person's mental health have been well documented. In an online article by the Prison Policy Initiative entitled, Research Roundup: Incarceration can cause lasting damage to mental health, the article talks about the debilitating effects of incarceration:

> We often talk about the disturbingly high numbers of people with mental health disorders locked up in prisons and jails. But less attention is paid to the ways in which incarceration itself perpetuates this problem by creating and worsening symptoms of mental illness. Research shows

---

[16] M. Massoglia and W.A. Pridemore, Incarceration and Health, 41 Annual Review of Sociology, 291-310 (2015), https://doi.org/10.1146/annurev-soc-073014-112326

[17] *Id.*

that, while it varies from person to person, incarceration is linked to mood disorders including major depressive disorder and bipolar disorder.

The carceral environment can be inherently damaging to mental health by removing people from society and eliminating meaning and purpose from their lives. On top of that, the appalling conditions common in prisons and jails — such as overcrowding, solitary confinement, and routine exposure to violence — can have further negative effects. Researchers have even theorized that incarceration can lead to "Post-Incarceration Syndrome," a syndrome similar to PTSD, meaning that even after serving their official sentences, many people continue to suffer the mental effects.[18]

Counsel is not requesting a variance based on Mr. Lewis mental health difficulties pursuant to USSG 5K2.13, but he respectfully asks that the court take into account the mental stresses that prions places on a person in conjunction with some of the other stressors placed on the body because of incarceration. These reasons can also justifiably enter into this Court's sentencing decision. *See, e.g., United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (A defendant's age, his prior minimal criminal record, and his medical condition are all valid considerations at sentencing because they relate to the history and characteristics of the defendant); *United States v. Foster*, 2012 WL 2863252, *5(N.D. Ill. 2012) ("At his original sentencing hearing, the Court found Foster's health concerns and his desire to rehabilitate his life to be mitigating factors taken into account pursuant to Section 3553(a).").

---

[18] K.R. Quandt and Alexi Jones, Research Roundup: Incarceration can cause lasting damage to mental health, Prison Policy Initiative, (2021), http://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/

### 3. Conclusion

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). Courts are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a).

Mr. Lewis respectfully requests this Court to follow that tradition and impose a sentence of two-hundred and forty months, with a term of supervised release to follow. This sentence is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in § 3553(a).

**4. Requests for Recommendations**

Mr. Lewis respectfully requests a sentence in a facility as close to the Southern District of Florida as possible so that it will be easier to maintain family visits.

Respectfully submitted,

HECTOR DOPICO
INTERIEM FEDERAL PUBLIC DEFENDER

By:     *s/Kafahni Nkrumah*
Kafahni Nkrumah
Assistant Federal Public Defender
Special Bar ID #A5502967
109 North Second Street
Fort Pierce, Florida 34950
Tel:  772-489-2123
E-Mail: Kafahni_Nkrumah@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on July 9, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     *s/Kafahni Nkrumah*
Kafahni Nkrumah